**FLUOROWARE, INC., Plaintiff,**

v.

**DAINICHI SHOJI K.K., Defendant.**

**No. CIV. 97–100/RHK/FLN.**

United States District Court,
D. Minnesota.

Oct. 31, 1997.

---

Jay Bennett, Dunkley, Bennett & Christensen, Minneapolis, MN, Steven Keough, Sri Sankaran, Patterson & Keough, Minneapolis, MN, for Plaintiff.

Robert DeMay, Jeffrey Grell, Susan Thompson, Leonard, Street and Deinard, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiff Fluoroware, Inc. ("Plaintiff") is a Minnesota company that manufactures plastic handling products ("PHPs"). Plaintiff entered into several distribution agreements with Defendant Dainichi Shoji K.K. ("Defendant"), a Japanese company, in which the Defendant agreed to distribute Plaintiff's PHPs in Japan. After the parties' distribution agreements expired, Plaintiff filed this suit, alleging breach of contract; tortious interference; unfair competition; misappropriation of trade secrets; unjust enrichment; and a claim for declaratory relief regarding the ownership of certain molds. This matter is before the Court on Defendant's Motion to Dismiss for Lack of Personal Jurisdiction, Forum Non Conveniens, and Failure to Join an Indispensable Party. For the reasons set forth below, the Court will grant the Defendant's Motion to Dismiss based upon Forum Non Conveniens.[1]

### FACTS

Plaintiff is a Minnesota corporation that designs and manufactures semiconductor component storage and transportation products, called PHPs, and fluid handling products ("FHPs") for use in the computer and

---

1. Because the Court will grant the Defendant's Motion based upon Forum Non Conveniens, it need not reach the issues of whether this Court has personal jurisdiction over the Defendant, and whether joinder of a necessary party would destroy diversity jurisdiction. Having decided this, however, the Court has grave reservations about whether it would be able to exercise jurisdiction over the Defendant for all of the Plaintiff's claims. The vast majority of the conduct that forms the basis of this lawsuit occurred outside of Minnesota. If this Court were required to decide the issue, it believes that it would find it could not exercise jurisdiction over the Defendant for the Plaintiff's declaratory judgment, tortious interference, and unjust enrichment claims.

microelectronics industries. (Helgeson Aff. ¶ 2.) In 1992, the Plaintiff opened a branch office in Tokyo, Japan, with up to 30 permanent employees working there. (Sugiyama Decl. ¶ 3.) In 1994, the Plaintiff established a sales office and warehouse operation in Tohoku, Japan, and in 1995, it opened sales offices in Kyushu and Osaka, Japan. (Thompson Aff. Ex. G (Oct. 17, 1995 letter from the Plaintiff to Nippon Valqua).)

Defendant is a Japanese company that distributes products to customers located primarily in Japan. (Sugiyama Decl. ¶ 4.)

### A. Agreements Between the Parties

In the late 1960s, the Defendant and the Plaintiff verbally agreed that the Defendant would be the Plaintiff's exclusive importer and distributor in Japan. (Sugiyama Decl. ¶ 12.) The Defendant contacted the Plaintiff in Minnesota to determine whether it was interested in such a relationship. (LaBute Aff. ¶ 3.) The parties operated under this agreement until the 1980s.

#### 1. *The Joint Venture—Nippon–Fluoroware* [2]

In 1983, the parties agreed to form a jointly-owned company that would manufacture PHPs and certain polypropylene wafer/disk handling products in Japan. (Sugiyama Decl. ¶ 18.) These products were too inexpensive to manufacture in the United States and then ship to Japan. (*Id.*) "The principal features of the 1984 Joint Venture Agreement were discussed and agreed upon in September 1983 at a meeting that occurred in Chaska, Minnesota. ." (LaBute Aff. ¶ 5.) As part of the Joint Venture Agreement, the parties agreed that the Defendant, and not the joint venture itself, would assume the risk of starting up the manufacturing operations in Japan, but the joint venture would

have the option of buying it from the Defendant in the future. (*Id.*; Sugiyama Decl. ¶ 19.) The parties discussed the final version of the Joint Venture Agreement in early 1984 in Monterey, California. (*Id.*)

The Plaintiff was concerned about investing substantial funds in a Japanese joint venture, and it requested that a company controlled by Shoji Fukushima ("Fukushima"), the Defendant's president, be included in the ownership group. (Sugiyama Decl. ¶ 19.) Fukushima then formed a Japanese company, Boeki ("Boeki"), for this purpose.[3] (*Id.*) The Plaintiff, the Defendant, and Boeki then formed a joint venture, Nippon–Fluoroware, with the Plaintiff owning 50%, the Defendant 30%, and Boeki 20%. (*Id.*) Fukushima resigned as the president of the Defendant[4] and became the chief executive officer of Nippon–Fluoroware.[5] (*Id.*) He remained as a director of the Defendant.[6] (*Id.*)

Under the Joint Venture Agreement, the parties agreed not to

> engage in the manufacture or sale in Japan of products which are in direct competition with products manufactured and sold by [Defendant] during the period in which it engaged in manufacturing pursuant to this Agreement, or thereafter, by Nippon-[Fluoroware]. Additionally, no party to this Agreement shall, without the consent of the other parties, disclose to any Japanese manufacturer information which, if utilized by said Japanese manufacturer, would improve its ability to compete with [Defendant], Nippon—[Fluoroware], Galtek, or [Plaintiff].

(LaBute Aff. Ex. 5 (Joint Venture Agreement).) The Joint Venture Agreement also stated that it would be governed and inter-

---

2. The joint venture was originally called Nippon Galtek, and in March 1989 it changed its name to Nippon–Flouroware. (Sugiyama Decl. ¶¶ 21–22.) The Court will refer to the joint venture as Nippon–Fluoroware.

3. Boeki is also known as Dainichi Trading Co., Ltd. ("DTC"). (Fukushima Reply Decl. ¶ 1.) The Defendant does not own an interest in or have any control over Boeki. (Sugiyama Decl. ¶ 6.)

4. In a letter that Fukushima wrote to the Plaintiff in 1991, he referred to himself as the president of

the Defendant. (*See* LaBute Aff. Ex. 18 (Aug. 9, 1991 letter from Fukushima to Plaintiff).)

5. Fukushima was forced to resign as president of Nippon–Fluoroware in August 1991. (Sugiyama Decl. ¶ 26.)

6. In August 1991, Fukushima resigned under pressure as a director of the Defendant. (Sugiyama Decl. ¶ 26; Fukushima Reply Decl. ¶ 2.)

preted in accordance with the laws of Minnesota. (*Id.*)

At the same time the parties executed the Joint Venture Agreement, Defendant signed a licensing agreement "entitling it to receive in confidence certain Fluoroware know-how and trade secret information but forbidding it from disclosing such information without Fluoroware's written consent." (LaBute Aff. ¶ 6.) The 1984 licensing agreement provides that it would be governed by and interpreted in accordance with the laws of Minnesota. (*Id.*)

In 1984, the Defendant began to manufacture products for the joint venture and distribute them in Japan. (Sugiyama Decl. ¶ 23.) In 1989, however, Nippon–Fluoroware bought all of the Defendant's assets associated with its manufacturing of FHPs and wafer/disk products for the joint venture. (*Id.* ¶ 24; Fukushima Reply Decl. ¶ 14.) The Defendant transferred to Nippon–Fluoroware all personal property, including molds, documents, and facilities associated with its manufacturing operations for the joint venture. (Fukushima Reply Decl. ¶ 14.) In addition, Nippon–Fluoroware hired all of the Defendant's employees who had worked on manufacturing for the joint venture. (*Id.*; Sugiyama Decl. ¶ 23.)

### 2. *The 1989 Agreement*

The Defendant claims that in 1983, Boeki became the sole importer of the Plaintiff's products, reselling them to the Defendant for distribution in Japan. (Sugiyama Decl. ¶¶ 19–20; Fukushima Reply Decl. ¶ 10.) From September 1983 until August 1991, Boeki submitted orders to the Plaintiff in Minnesota. (Fukushima Reply Decl. ¶ 10.) In 1989, the Plaintiff and Boeki entered into a two-year distribution agreement (the "1989 Agreement"), in which Boeki received the exclusive distribution rights to certain of the Plaintiff's products and non-exclusive rights as to others.[7] (Sugiyama Decl. ¶ 25.) This agreement was finalized in meetings that were held in Minnesota on October 2–3, 1989. (LaBute Aff. ¶ 7.)

### 3. *The 1991 Agreement*

In 1991, the Plaintiff and the Defendant entered into a distribution agreement ("the 1991 Agreement"). (Sugiyama Decl. ¶ 28; DeMay Aff. Exs. H & I (noting that the Defendant will begin buying the Plaintiff's products directly from the Plaintiff).) The Defendant claims that it was presented with this agreement in Japan, while the Plaintiff claims that the parties negotiated and finalized the 1991 Agreement in Minnesota. The 1991 Agreement granted the Defendant the same distribution rights that Boeki had under the 1989 Agreement. (Sugiyama Decl. ¶ 28.) The 1991 Agreement provides that it will be governed by and interpreted according to Minnesota law. On July 23, 1992, the parties held a meeting in Minnesota regarding the 1991 Agreement and related ongoing disputes between the parties. (*Id.* ¶ 58(d); Thompson Aff. Ex. J (notes from the July 23, 1992 meeting between the parties).)

Beginning in late 1993, the Plaintiff's sales office in Japan began contacting the Defendant's customers in Japan, telling them that they should order certain products directly from the Plaintiff's Japanese office, and not from the Defendant. (Sugiyama Decl. ¶ 32.) In April 1994, the Plaintiff informed the Defendant that when the 1991 Agreement expired, the Plaintiff would begin to sell directly all of its FHPs in Japan. (*Id.* ¶ 33.)

### 4. *The 1995 Agreement*

In 1995, the parties entered into another distribution agreement (the "1995 Agreement"). (Sugiyama Decl. ¶ 42.) In the 1995 Agreement, the Plaintiff granted the Defendant a non-exclusive right to distribute a limited set of wafer-disk handling products in Japan until January 31, 1997. (*Id.*) Under a separate tool usage agreement executed at the same time, the Plaintiff agreed to pay the Defendant a license fee for seven years for its sale of products that Valqua or Nippon–Fluoroware manufactured using any molds to which the Defendant asserted ownership.

---

**7.** The Plaintiff contends that it entered into the 1989 Agreement with the Defendant, and not Boeki. (Pl.'s Mem. in Opp'n to Mot. to Dismiss at 7 n.3.) ("Pl.'s Mem.") The Court believes that the identity of the other party to the 1989 Agreement is not relevant to the Defendant's Motion to Dismiss based on forum non conveniens.

(*Id.*) Both of these agreements were negotiated in Japan. (*Id.* ¶ 56(c).)

### 5. *The End of the Parties' Relationship*

After the parties ended their exclusive distribution agreement in 1995, the Defendant began to look for other FHPs to distribute in Japan. Boeki found other sources of FHPs in California and Arizona, and began to import them for the Defendant, who resold them to Japanese customers. (Sugiyama Decl. ¶¶ 36–37.) In addition, the Defendant began to manufacture PHPs through other Japanese subcontractors. (*Id.* at ¶ 43.) It also constructed an injection molding facility in Yonazawa, Japan, and enticed several Nippon–Fluoroware employees to start working for it.[8] (LaBute Aff. ¶ 14.) The Defendant claims that it sold its PHPs primarily to Japanese customers and that it has not promoted or sold them anywhere within the United States. (Sugiyama Decl. ¶ 43.)

In 1996, the Plaintiff claims that the Defendant "began vigorously pursuing a variety of marketing activities designed to position itself as a direct competitor of [the Plaintiff]." (Pl.'s Mem. at 8.) It contends that the Defendant disclosed confidential trade secret information to Japanese manufacturers, including Sanyo Manufacturing Company. (LaBute Aff. ¶ 14.) The Defendant also attempted to sell a "knock-off" version of the Plaintiff's A192 wafer carrier to Japanese companies, as well as to companies in Vancouver, Washington and Roseville, California.[9] (*Id.* ¶ 16.)

In November 1996, the Plaintiff, together with another Japanese company, Valqua, formed a new Japanese corporation, Fluoroware Valqua. (Sugiyama Decl. ¶¶ 9, 47, 49.) The Plaintiff owns a majority and controlling interest in Fluoroware Valqua. (*Id.*) Shortly thereafter, Fluoroware Valqua began to distribute the Plaintiff's products in Japan. (*Id.*)

### B. Defendant's Other Contacts with Minnesota

Throughout the 1980s, the Defendant made numerous contacts with the Plaintiff in Minnesota. (Helgeson Aff. ¶¶ 20–24; LaBute Aff. ¶¶ 7–13.) Its representatives visited Minnesota each year. (Kos Aff. ¶¶ 6–8; LaBute Aff. ¶ 10 (The Defendant's "representatives have personally visited [the Plaintiff's] Chaska facilities at least once each year for at least the past 15 years.")). In 1985, the Defendant sent four representatives to Minnesota for extensive training on how to mold plastics; this training lasted for a period of six months for three of the employees and nine months for the fourth. (Helgeson Aff. ¶ 20.) Two of the Defendant's employees, Takito Fukushima and Takashi Saito, made two visits to Minnesota between 1985 and 1989 in which they asked for advice from the Plaintiff on problems they were having with the joint venture's manufacturing.[10] (*Id.* ¶ 21.) During these visits to Minnesota, the Defendant saw and used Plaintiff's molds, products, injection molding machines, and specialized manufacturing techniques. (*Id.* ¶¶ 20–24.)

Throughout the 1980s and 1990s, the Defendant's representatives traveled to Minnesota for shareholders' and directors' meetings for Nippon–Fluoroware. (LaBute Aff. ¶ 22.) Aside from visits to Minnesota for Nippon–Fluoroware shareholder's and director's meetings, the Defendant has made at least three trips to Minnesota during the 1990s to discuss problems with wafer carrier materials with the Plaintiff's employees or to discuss relations between the Plaintiff and the Defendant. (Sugiyama Decl. ¶ 58.)

---

**8.** Several of these employees had worked for the Defendant when it produced FHPs and wafer/disk products for the joint venture; and in 1989, when Nippon–Fluoroware bought these production facilities from the Defendant, they became employees of Nippon–Fluoroware. (Sugiyama Decl. ¶ 23.)

**9.** The Defendant sent its "knock-off" product to SEH in Vancouver, Washington. (LaBute Aff. ¶ 16.) SEH is a Japanese company whose headquarters are in Tokyo. (*Id.*)

**10.** The Defendant employed these people in connection with the joint venture's manufacturing operations in Japan. (Sugiyama Reply Decl. ¶ 8.) In 1989 when Nippon–Fluoroware bought these operations from the Defendant, all of these employees, except for Takito Fukushima, became employees of Nippon–Fluoroware. (Fukushima Reply Decl. ¶ 14.) Takito Fukushima remained an employee of the Defendant until February 1992, even though he was employed at the joint venture's facility in Japan. (*Id.* ¶ 15.)

During its visits to Minnesota, the Plaintiff also gave the Defendant confidential design drawings of various molds and products. (LaBute Aff. ¶ 11.) The Defendant claims that these design drawings are for marketing purposes and that the Plaintiff routinely gives them to its customers without requiring them to make a confidentiality commitment. (Sugiyama Reply Decl. ¶ 6.) The Defendant contends that the Plaintiff gave it these drawings so it could give them to actual or potential customers. (*Id.*)

Throughout the 1980s and 1990s, the Defendant sent hundreds of letters and other documents to Minnesota. (LaBute Aff. ¶ 13, Helgeson Aff. ¶¶ 22–23.) It contacted the Plaintiff in Minnesota and requested that the Plaintiff send it confidential, technical information about the design and manufacture of its products. (*Id.* ¶¶ 22–23.) In addition, it sent thousands of purchase orders to Minnesota, calling for delivery for the shipments of Plaintiff's products "F.O.B. Chaska [,Minnesota]." (LaBute Aff. ¶ 17.) The Defendant, however, claims that between 1983 and 1991, it did not purchase any products from the Plaintiff; instead, Boeki bought them from the Plaintiff and, in turn, resold them to the Defendant for distribution in Japan. (Sugiyama Decl. ¶ 6.)

## Analysis

### I. Forum Non Conveniens

Under the doctrine of forum non conveniens, federal district courts have the inherent power to resist the imposition of jurisdiction even where authorized by statute if "the litigation can more appropriately be conducted in a foreign tribunal." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 67 S.Ct. 839, 840, 91 L.Ed. 1055 (1947) (citation omitted). Initially, the district court must determine whether an adequate, alternative forum is available to hear the case. *Reid–Walen v. Hansen*, 933 F.2d 1390, 1393 n. 2 (8th Cir. 1991). An alternative forum is available if all parties are amenable to process and come within the jurisdiction of that forum. *Id.* An alternative forum is adequate if "the parties will not be deprived of *all remedies* or treated unfairly." *Id.* (emphasis added).

The Defendant argues that Japan is an adequate, alternative forum, and it has promised to waive any statute of limitations defense in the Japanese actions that did not exist at the time the Plaintiff filed this action in Minnesota. (Def.'s Mem. at 19.) The Plaintiff concedes that Japan is an available forum, but it contends that it is not adequate because its Lanham Act claim for unfair competition would not be cognizable in Japan and because discovery is not available in Japanese courts. (Pl.'s Mem. at 25.)

The Court finds that Japan is an adequate, alternative forum. An alternative forum is inadequate if a party will be deprived of *all remedies* there. *Reid–Walen*, 933 F.2d at 1393 n. 2. The fact that the Plaintiff will not be able to bring one claim of a multi-count complaint does not render an alternative forum inadequate. *See De Melo v. Lederle Labs.*, 801 F.2d 1058, 1061 (8th Cir.1986)("Where the alternative forum offers a remedy for the plaintiff's claims, and there is no danger that she will be treated unfairly, the foreign forum is adequate."); *see also Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768–69 (9th Cir.1991) (noting that Japan was an adequate, alternative forum even though the Plaintiff might not be able to bring its RICO or Lanham Act claims there); *Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822, 829 (2d Cir.1990) (holding that Japan was an adequate, alternative forum even though it did not provide all the same remedies as courts in the United States). Moreover, the fact that Japanese courts do not conduct discovery in the same manner as United States courts does not make Japan an inadequate forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 102 S.Ct. 252, 261, 70 L.Ed.2d 419 (1981) (noting that the fact that the alternative forum's law is less favorable to the plaintiff should not be given substantial weight in a *forum non conveniens* determination).

Once the district court determines that an adequate, alternative forum exists, "it must balance factors relative to the convenience of the litigants, referred to as the private interest, and factors relative to the convenience of the forum, referred to as the public interests, to determine which available forum is most appropriate for trial and resolution." *De Melo*, 801 F.2d at 1060. The

factors which bear on the private interest of the litigants include:

(1) the relative ease of access to sources of proof;

(2) the availability of compulsory process for attendance of unwilling witnesses and the cost of obtaining attendance of willing witnesses;

(3) possibility to view the premises, if view would be appropriate;

(4) all other problems that make trial of a case easy, expeditious and inexpensive; and

(5) questions as to the enforceability of a judgment if one is obtained.

*See Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6; *Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843. The public factors include:

(1) the administrative difficulties flowing from court congestion;

(2) the "local interest in having localized controversies decided at home;"

(3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action;

(4) the avoidance of unnecessary problems in conflict of law or in the application of foreign law; and

(5) the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6.

■■■■■ The defendant bears the burden of persuasion in proving all elements necessary for the court to dismiss a complaint based upon forum non conveniens. *Reid–Walen*, 933 F.2d at 1393. District courts must give deference to a plaintiff's forum choice. *Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* Although such a plaintiff's choice is not dispositive, jurisdiction should be declined only in "exceptional circumstances." *Id.*, 330 U.S. at 504, 67 S.Ct. at 841.

■■■■■ Courts, however, have lessened the deference they give to a plaintiff's choice of forum when the plaintiff is an American company that engages in international business.

When an American corporation doing extensive foreign business brings an action for injury occurring in a foreign country, many courts have partially discounted the plaintiff's United States citizenship.... "In an era of increasing international commerce, parties who choose to engage in international transactions should know that when their foreign operations lead to litigation they cannot expect always to bring their foreign opponents into a United States forum when every reasonable consideration leads to the conclusion that the site of the litigation should be elsewhere."

*Reid–Walen*, 933 F.2d at 1390 (quoting *Contact Lumber Co. v. P.T. Moges Shipping Co., Ltd.*, 918 F.2d 1446, 1450 (9th Cir.1990)).

### A. The Private Factors

■■■■■ Keeping in mind the deference this Court must give to the Plaintiff's choice of forum, the Court finds that the private factors weigh heavily in favor of dismissing the instant case pursuant to the doctrine of forum non conveniens.

The Plaintiff correctly notes that some of the evidence in this case is located within Minnesota, including technical design drawings, product test data, customer's specifications, product requests, contracts, and correspondence between the parties. Much of this evidence must also exist in Japan, however, because the Plaintiff claims that the Defendant obtained this information from the Plaintiff, disclosed it to others in Japan, and used it in Japan to create "knock-off" products.[11] (*See* LaBute Aff. ¶¶ 14–15.)

The Court finds that a more substantial amount of the evidence is located in Japan, including the molds and technology whose ownership is at issue, other confidential information that the Plaintiff allegedly gave the Defendant, much of the confidential information that the Plaintiff allegedly sent the Defendant, the actual plants where the Defendant produces the "knock-off" products, and the vast majority of the customers to whom the Defendant distributed the Plaintiff's products and for whose business the parties are currently competing. Moreover,

---

**11.** The Plaintiff admits that much of this evidence exists in Japan because it communicated it to the Defendant in some fashion. (Pl.'s Mem. at 26.)

much of the relevant evidence in Japan would need to be translated from Japanese to English in order to be utilized in this Court. *See De Melo*, 801 F.2d at 1062–63 (upholding dismissal of plaintiff's claim under forum non conveniens when most, but not all, of the evidence was located in Brazil and would need to be translated into English).

The Plaintiff correctly notes that all of its employee witnesses are located in Minnesota and that with the exception of LaBute, none of them speaks Japanese. LaBute, who is one of the Plaintiff's key witness, however, spends a large percentage of his time working in Japan. The Plaintiff has identified no other witnesses who are located in Minnesota.

Aside from these witnesses, the majority of remaining witnesses are located in Japan.[12] While some of these witnesses are the Defendant's employees, whom the Court assumes would voluntarily come to Minnesota to testify, many key witnesses, including the Defendant's and Nippon–Fluoroware's former president, Shoji Fukushima, and his son, Takito Fukushima, no longer work for the Defendant. The Defendant would be unable to secure their testimony if the case remained in Minnesota. All of these witnesses would need translators in order to testify. Moreover, the Plaintiff's claims primarily involve the Defendant's conduct *in Japan;* it accuses the Defendant of breaching contracts involving the Defendant's distribution of its products in Japan and of unfairly competing with the Plaintiff in the Japanese market. Many of the potential, non-party witnesses are located in Japan, outside of this Court's compulsory process. Even if the parties were to travel to Japan and take these witnesses' depositions for use at trial, the costs involved would be very large. *See Mizokami Bros. of Ariz., Inc. v. Mobay Chem. Corp.,* 660 F.2d 712, 718 (8th Cir.1981) (upholding dismissal based upon forum non conveniens

where many of the witnesses were in Mexico and it would be impossible or prohibitively expensive to obtain their attendance in the forum state).

Another factor the Court must consider is the possibility to view the premises, if such a viewing would be appropriate. In the instant case, the Plaintiff claims that the Defendant stole its trade secrets and is currently using them to manufacture products that compete with the Plaintiff's products. In these circumstances, a view of the Defendant's production plants in Japan would be appropriate, in order to see if it is using the Plaintiff's trade secrets to manufacture its own products.

Finally, the Court must consider any questions regarding the enforceability of a judgment if one is obtained. If this Court were to issue a judgment in the instant case, the Plaintiff would have to seek an enforcement judgment by filing a petition with a district court in Japan. (Yamanouchi Decl. ¶ 15.) In order to receive such an injunction, the Japanese court would have to conclude that this Court possessed proper international jurisdiction over the Defendant, and if any Japanese courts have made any rulings to the contrary, it would not enforce this Court's order.[13] (*Id.*) The Japanese courts would need to become involved in this matter in order for the Plaintiff to obtain complete relief by enjoining the Defendant's conduct in Japan, and it is uncertain whether they would enforce this Court's ruling in the instant case. This factor, therefore, points strongly in favor of dismissing the Plaintiff's complaint. *See McDonald's Corp. v. Bukele,* 960 F.Supp. 1311, 1319 (N.D.Ill.1997) (dismissing the plaintiff's complaint under forum non conveniens, in part because the plaintiff would have to resort to El Salvador's courts in order to obtain actual relief in El Salvador).

12. The Plaintiff claims that some customers to whom the Defendant gave its "knock off" product are located in other parts of Asia, Europe, and the United States. (Pl.'s Mem. at 27.) Because none of them are located within Minnesota, they are all outside of the scope of this Court's compulsory process. Even if the case remained in Minnesota, this Court could not ensure their testimony, and the costs of taking their depositions to be used at trial would be great.

13. Several actions are currently pending in various courts in Japan regarding the ownership rights to several of the molds at issue in the instant case and whether the Defendant breached its contracts with the Plaintiff and unfairly competed with it. (Yamanouchi Decl. ¶¶ 1–5.)

## B. The Public Factors

The Court finds that the public factors weigh heavily in favor of dismissing the Plaintiff's claims. Minnesota does have an interest in providing a forum for its residents to litigate their claims, but this interest is small compared to Japan's interest in regulating companies that conduct business within its boundaries. This dispute involves the Plaintiff's business in Japan, the Defendant's conduct in Japan, and its competition with the Plaintiff in the Japanese market. The Plaintiff itself, through correspondence it sent before it started this action, acknowledged that conduct and events about which it complains implicate the Japanese market. (*See* Thompson Aff. Ex. A) (Apr. 27, 1993 letter from the Plaintiff to Valqua recognizing that its non-exclusive distribution agreement with the Defendant "will allow [it to] maximize flexibility as [it] tailor[s its] sales network to best support *the Japanese customer*" (emphasis added)); *Id.* Ex. E (Oct. 18, 1994 letter from the Plaintiff to the Defendant stating that it wanted to enter into a new distribution agreement with the Defendant "so long as we believe *our business interests in Japan are adequately protected*" (emphasis added)); *Id.* Ex. G (Oct. 17, 1995 letter from the Plaintiff to Valqua noting that its decision to end its distribution contract with the Defendant "may be one of the most important decisions [the Plaintiff] has ever made *with regard to our future in the Japanese and Asian markets* .... Nevertheless, we feel compelled to risk the relative stability that exists today in order to better assure our position *in this crucial market* in the future." (emphasis added)). Minnesota citizens and this Court should not be burdened with deciding this complicated business dispute that primarily involves the Japanese economy and competition between two companies doing business in Japan.

Minnesota's interest is further minimized by the fact that, while the Plaintiff is a Minnesota company, it does a substantial part of its business in Japan, including maintaining several offices there and owning the controlling shares in two Japanese companies.[14] Despite the fact that this case involves a Minnesota company, the Court believes it is more properly characterized as a Japanese controversy that should be decided in Japan, and not in Minnesota. The Court, therefore, will grant the Defendant's Motion to Dismiss based upon forum non conveniens.

### Conclusion

■ Based on the foregoing, and upon the files, records, and proceedings herein, **IT IS ORDERED** that the Defendant's Motion to Dismiss based upon Forum Non Conveniens (Doc. No. 14) is **GRANTED**, and the Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE.**[15]

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

---

**14.** The contracts involved in the instant case contain choice of law provisions which state that Minnesota law will govern any disputes regarding them. This Court, however, does not believe that this factor, standing alone, warrants keeping this case in Minnesota, especially when viewed in light of Japan's strong interest, and Minnesota's relatively weak interest, in the case.

**15.** This dismissal is conditioned upon the Defendant waiving any statute of limitations defenses in any Japanese action that did not exist at the time the Plaintiff filed this action in Minnesota.