**LINKCO, INC., Plaintiff,**

v.

**NICHIMEN CORP. and Kiyoto Kanda, Defendants.**

**No. 00–CV–11050–PBS.**

United States District Court, D. Massachusetts.

Sept. 17, 2001.

Michael J. Tuteur, Epstein, Becker & Green, P.C., Russell Beck, Epstein, Becker & Green, Boston, MA, Irving B. Levinson, Michael McCullough, Mindy J. Nam, Piper Marbury Rudnick & Wolfe, Chicago, IL, David Israel, Sessions, Fishman & Nathan, LLP, Metairie, LA, for Plaintiff.

Eric J. Marandett, Mark S. Freeman, Choate, Hall & Stewart, Boston, MA, Ralph Mantynband, Shefsky & Froelich Ltd., Chicago, IL, Patrick T. Clendenen, John J. Tangney, Jr., Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, Thomas F. Sax, Pederson & Houpt, P.C., Chicago, IL, Jay J. Tangney, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

This is a dispute over an international business deal gone bad. The plaintiff, a start-up American Internet company, has brought suit against the defendants, a Japanese company and a Japanese individual, alleging fraud, breach of a confidentiality agreement, and misappropriation of trade secrets. The defendants have moved to dismiss on forum non conveniens grounds. For the reasons stated below, the Court **ALLOWS** the motion of defendant Nichimen Corporation and **DENIES** the motion of defendant Kiyoto Kanda.

## I.  BACKGROUND

The following facts, many of which are disputed by the defendants, are drawn from the complaint, unless otherwise noted.

### A.  The parties

LinkCo, Inc. ("LinkCo"), a Delaware corporation, was formed for the purpose of

disseminating information contained in the annual filings of Japanese public corporations to the United States and other countries. More specifically, LinkCo set out to develop and implement an internet-based database of Japanese business information and a corporate disclosure and repository system similar to the Securities and Exchange Commission's "EDGAR" system.[1] Since February 1999, LinkCo has had its principal place of business in Illinois. Prior to that, LinkCo's principal place of business was Massachusetts. David Israel–Rosen ("Israel–Rosen") founded Japan Infonet, the predecessor to LinkCo, in 1995.

Defendant Nichimen Corporation ("Nichimen"), a Japan-based corporation, is a general trading company (*sogo shosha*) with numerous subsidiaries dealing in such areas as energy, chemicals, plastics, household and consumer products, metals, and machinery. Nichimen has offices in roughly 90 cities nationwide, including nine offices in the United States.

Defendant Kiyoto Kanda ("Kanda") is a Japanese citizen who lives and works in Japan. He began working with LinkCo in December 1995 to assist in implementing LinkCo's business plan in Japan. In 1996 Kanda assumed an executive position at LinkCo's office in Japan, LinkCo Japan.

## B. The Nichimen deal

In its search for funding sources, in April 1996, LinkCo entered into discussions with Nichimen concerning a large potential investment. Prior to those discussions, LinkCo claims that the two parties entered into a mutual confidential non-disclosure agreement under which each party agreed that the information disclosed during negotiations would only be used for investment-evaluation purposes and would not be passed on to third parties. The written agreement also allegedly provided that any tangible forms of confidential information delivered to a party would remain the property of the party disclosing the information and would be returned promptly upon written request.

LinkCo's initial negotiations with Nichimen took place in meetings in Japan and over phone conferences between the United States and Japan.

During the ongoing negotiations, Nichimen allegedly prepared a *ringi-sho,* an internal document that is commonly used in Japanese businesses to detail a project for a group decision. The *ringi-sho* recommended an initial investment of $2 million in LinkCo, and indicated that Nichimen would supply a subsequent investment, provided that LinkCo could obtain additional funding from another major investor. The specifics of the *ringi-sho* were never disclosed to LinkCo. On December 30, 1996, Nichimen invested $2 million in LinkCo.

In a meeting on February 28, 1997 between LinkCo and, Nichimen, LinkCo informed Nichimen that Mitsubishi Corporation ("Mitsubishi") had expressed serious interest in investing in LinkCo. Nichimen voiced disapproval, stating that Japanese trading companies such as Mitsubishi and Nichimen typically do not invest in the same enterprise. Although Mitsubishi re-

---

1. The SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system "performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the [SEC]. Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate information filed with the agency." SEC Website, Important Information About EDGAR, *http://www.sec.gov/edgar/aboutedgar.htm.*

mained interested in investing, Nichimen strongly opposed LinkCo's obtaining any funding from Mitsubishi.

In a meeting on March 26, 1997, Nichimen allegedly stated that it would make a second $2 million investment if LinkCo agreed to terminate its negotiations with Mitsubishi. LinkCo ended its negotiations, not only with Mitsubishi, but also with other potential investors.

The parties negotiated extensively over the form the investment would take. Nichimen initially favored an investment mechanism using convertible indebtedness, but later sought an investment consisting solely of equity. Ultimately, on April 16, 1997, the parties agreed that Nichimen would pay $1,976,000 for 1,235,000 shares of Series B Convertible Preferred Stock at a price of $1.60 per share. As a caveat to the investment arrangement, LinkCo agreed not to close any funding deals with other parties until December 1997. LinkCo prepared documents memorializing this agreement and circulated them to Nichimen.

## C. Balking by Nichimen

Approximately three months later, Nichimen began to balk at completing the investment deal. In a meeting on July 17, 1997, Nichimen proposed that it be given joint ownership rights in LinkCo's trademarks and copyrights. LinkCo rejected this proposal. Nichimen then proposed the formation of a new company, to be jointly owned by Nichimen and LinkCo, through which LinkCo's products and services could be marketed. Nichimen also requested that it be permitted to conduct a thorough "due diligence" review of LinkCo's business in order to develop an acceptable joint business plan.

Over the next month, representatives of Nichimen traveled to LinkCo's then-headquarters, located in Massachusetts. Nichi-

men reviewed LinkCo's confidential business information including its business strategy, product designs, definitions, demonstrations, and trade secrets. According to LinkCo, all of this information was made available under the express understanding that Nichimen would only use its access to LinkCo's proprietary information for the purpose of evaluating its investment opportunity.

On August 11, 1997, Nichimen's investment committee, relying on the requirement in the *ringi-sho* for additional investment sources, rejected a second investment in LinkCo. Given that LinkCo had terminated all other funding negotiations at Nichimen's request, LinkCo was unable to secure sufficient funding to continue its operations.

According to LinkCo, Nichimen has since used LinkCo's proprietary information to form its own competitive business venture.

## D. The alleged Kanda heist

LinkCo alleges that Kanda first began to work with LinkCo in December 1995, while LinkCo was negotiating with a Japanese company to develop a pilot of its corporate disclosure and repository system. Later, in May 1996, LinkCo hired Kanda to serve as President of its Japanese subsidiary, LinkCo Japan. LinkCo also alleges that Kanda was named Vice-President of LinkCo, which Kanda denies.

Also in May 1996, Kanda allegedly entered into a noncompetition, nondisclosure, and nonsolicitation agreement with LinkCo. The plaintiff has not produced a copy of this purported agreement. In his affidavit, Israel–Rosen states:

I distinctly remember Kanda signing the agreement because he did so at the same time and in the same room that [numerous other people] and I all signed

identical agreements. In this agreement, Mr. Kanda acknowledged that LinkCo's technology, as well as its other trade secrets, trademarks, service marks, and other confidential information were LinkCo's property and that he would not use, disclose, or copy these materials without LinkCo's authorization. Mr. Kanda further agreed that he would not compete with LinkCo during his employment or for 18 months thereafter.

(Israel–Rosen Aff. at ¶ 11.) Kanda has denied that he signed the noncompetition, nondisclosure, and nonsolicitation agreement.

At LinkCo Japan, Kanda was charged with overseeing the daily operation and marketing of the company, locating investors, registering the company in Japan, and registering its trademarks and service marks. In the course of his duties, Kanda allegedly made numerous trips to Massachusetts, where he had unrestricted access to LinkCo's proprietary and confidential information.

LinkCo alleges that, shortly after it provided Kanda with access to its trade secrets, Kanda disregarded his instructions from LinkCo and registered LinkCo's Japanese trademarks as his own. (Kanda claims he registered the trademarks under his own name with permission of LinkCo). In addition, LinkCo alleges that Kanda began collaborating with Fujitsu, Ltd. ("Fujitsu"), a Japanese competitor of Link-Co, in order to develop LinkCo's products on behalf of the competitor. While still in LinkCo's employ, LinkCo claims, Kanda traveled to the United States with Fujitsu employees and allowed Fujitsu to gain access to LinkCo's technology and trade secrets.

LinkCo alleges that, as the coup de grâce, Kanda misappropriated control over the Japanese subsidiary, LinkCo Japan. According to Israel–Rosen's affidavit, Kanda convened a secret meeting of the shareholders of LinkCo Japan at which he issued Israel–Rosen's resignation by using forged signature seals (*hankos*) and installed himself, two associates, and his wife as directors. Shortly thereafter, Kanda allegedly changed the company name to Japan Digital Disclosure, which retained the registration of LinkCo's trademarks.

The plaintiff alleges that Kanda continues to market LinkCo's technology on behalf of its competitor, Fujitsu.

### E. Judicial jousting

In the aftermath of these events, both parties sought the assistance of the courts. This resulted in the filing of competing lawsuits in different countries.

#### 1. Japanese action

In February 1998, Nichimen filed a declaratory judgment action against LinkCo in the District Court (*chihō saibansho*) of Tokyo. Initially Nichimen sought only a declaration from the Japanese Court that it was under no obligation to provide Link-Co the additional $1,976,000 in funding. Later, when LinkCo filed an action in United States District Court for the Northern District of Illinois, Nichimen petitioned the Japanese court to hear fraud and trade secret claims that were essentially the same as those raised by LinkCo in the Illinois suit.[2] LinkCo and Israel–

---

**2.** Some legal commentators might describe Nichimen's addition of further claims following the initiation of LinkCo's suit in the United States as a form of "double action."

Double action occurs when a foreign plaintiff initiates a claim in a country outside Japan, and before the judgment is rendered, the Japanese defendant (now a plaintiff) brings suit in Japan, seeking a judicial dec-

Rosen were named as defendants. The Japanese court found that LinkCo sent Nichimen a letter on September 30, 1997, threatening to bring suit unless Nichimen came through with an investment of $1,976,000. It was the receipt of this letter that apparently prompted Nichimen to bring suit in Japan.

The Japanese court took evidence and heard arguments over the course of several months. LinkCo contested the merits of the claims as well as the court's jurisdiction and the validity of service of process. Israel–Rosen, LinkCo's representative, did not participate in the proceedings. LinkCo maintains that he was too ill to attend; Nichimen notes that he was well enough to travel to Beijing and Japan immediately before the court sessions. The only LinkCo employee who was present and examined before the court was James Cook, LinkCo's Vice Chairman. According to the judge, much of his testimony was unreliable as predicated on hearsay. LinkCo did not submit either of the alleged nondisclosure agreements to the court, nor did it submit a description of the trade secrets and proprietary information allegedly stolen by Nichimen. Although Kanda was not a party to the Japanese case, he gave testimony before the court.

Shortly before this Court heard defendants' motion to dismiss, the Japanese court issued its decision. In a twenty-one page written opinion, Judge Tadahiko Noguchi ruled in favor of Nichimen on all counts. The court allowed Nichimen to add the fraud and trade secret claims and rejected LinkCo's challenges based on invalid service of process and lack of jurisdiction. On the merits of the case, the court held that Nichimen was not bound by an agreement to provide $1,976,000 in funding to LinkCo. The court also held that Nichimen was under no contractual obligation to refrain from disclosing or using trade secrets obtained from LinkCo. Lastly, the court held Nichimen was not liable in tort or in an action for fraud and did not violate 18 U.S.C. § 1832 (the federal Economic Espionage Act of 1996), Mass. G.L. ch. 93A (the Massachusetts unfair business practices statute), or Mass.G.L. ch. 266, § 30 (the Massachusetts larceny statute).

The court also criticized what it perceived as LinkCo's lack of respect for the tribunal. The court noted that Israel–Rosen's excuses for failing to appear were poorly documented and inconsistent with the fact that he appeared to be traveling extensively to Beijing and Japan during the same time period. LinkCo asserts that it plans to appeal the decision.

### 2. Northern District of Illinois action

On November 30, 1999, LinkCo filed a diversity action in the United States District Court for the Northern District of Illinois against Nichimen and Kanda.[3]

laration as to the non-existence of facts to support the claim that is the basis of the foreign action. Once the Japanese court has concluded that there is no liability and enters a judgment for the Japanese party, the presentation of the subsequently decided foreign suit for recognition and enforcement must be rejected on public policy grounds (e.g. res judicata).

Michael P. Waxman, *Enforcing Private Antitrust Decisions in Japan: Is Comity Real?*, 44 DePaul L.Rev. 1119, 1138 n. 77 (1995) (cita-

tions omitted). *See also* Takao Sawaki, *Recognition and Enforcement of Foreign Judgments in Japan*, 23 Int'l Law. 29, 34–35 (1989) (criticizing double action practice).

**3.** LinkCo filed a separate action against Fujitsu in the United States District Court for the Northern District of Illinois for misappropriation of trade secrets. The Court dismissed the complaint for lack of personal jurisdiction over Fujitsu. LinkCo later filed a substantially identical complaint against Fujitsu in the

The complaint contained claims against Nichimen for fraud (Count I), theft/conversion of trade secrets (Count II), breach of contract (Count III), promissory estoppel (Count IV), and breach of the confidentiality/non-disclosure agreement (Count V). The complaint contained claims against Kanda for breach of employment, noncompetition, nondisclosure and nonsolicitation agreement (Count VI), fraud (count VII), breach of fiduciary duty (Count VIII), and theft/conversion of trade secrets (Count IX). The complaint also contained a claim against both defendants for violation of Mass.G.L. ch. 93A (Count IX).

Nichimen brought a motion to dismiss the complaint on forum non conveniens grounds or, in the alternative, to stay the action during the pendency of the Japanese case. After the filing of Nichimen's motion, LinkCo voluntarily dismissed the action on May 26, 2000.

### 3. Present action in Massachusetts

On the same day it dismissed its action in Illinois, LinkCo filed the complaint in the present action. The complaint is nearly identical to the complaint filed in the Illinois action. It contains claims against Nichimen for fraud (Count I), theft/conversion of trade secrets (Count II), breach of contract (Count III), promissory estoppel (Count IV), and breach of confidentiality/non-disclosure agreement (Count V). It contains claims against Kanda for breach of employment, noncompetition, nondisclosure and nonsolicitation agreement (Count VI), fraud (count VII), breach of fiduciary duty (Count VIII), and theft/conversion of trade secrets (Count IX). Finally, it contains a claim against both defendants for violation of Mass.G.L. ch. 93A (Count IX).

The defendants have moved to dismiss the complaint based on the doctrine of forum non conveniens.[4] This Court heard arguments on July 17, 2001.

## II. ANALYSIS

### A. Doctrinal framework

"The doctrine of forum non conveniens permits a trial court, on a discretionary basis, to dismiss a case where an alternative forum is ... available in another country that is fair to the parties and substantially more convenient for them or the courts." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 719 (1st Cir.1996) (citing *Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 947 (1st Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992)), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997). "But since there is a strong presumption in favor of the plaintiff's forum choice, the defendant must bear the burden of proving both the availability of an adequate alternative forum, and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum." *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1349 (1st Cir.1992) (citations omitted), *cert. denied,* 508 U.S. 912, 113 S.Ct. 2346, 124 L.Ed.2d 255 (1993). *See also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 259, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

The first criterion, the availability of an alternative forum, is straightforward: it is satisfied "if the defendant demonstrates that the alternative forum addresses the

United States District Court for the Southern District of New York. That action is still pending.

4. Nichimen originally argued in the alternative for a stay of this action during the pendency of the case before the Japanese court. *See Goldhammer v. Dunkin' Donuts, Inc.,* 59 F.Supp.2d 248 (D.Mass.1999) (granting stay on international abstention grounds). Given that the Japanese court has already rendered judgment, the stay request is moot.

types of claims that the plaintiff has brought and that the defendant is amenable to service of process there." *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir.2000).

The second criterion, however, "evokes a more sophisticated balancing: the defendant must show that the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal." *Id.* The " 'private' interest factors include relative ease of access to sources of proof, availability of compulsory process, comparative trial costs, ability to enforce a judgment, and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Nowak*, 94 F.3d at 719 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). "Public" interest factors include the "practical difficulties of unnecessarily imposing upon a busy court the obligation to hear a case more fairly adjudicated elsewhere, the imposition on jurors called to hear a case that has no relation to their community, and the familiarity of the court with applicable laws." *Id.* at 719–20, 94 F.3d 708. This list of factors is "a helpful starting point, but not every item applies in every case and, in the last analysis, the list of factors is illustrative rather than all-inclusive." *Iragorri*, 203 F.3d at 12. "The ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 527, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

**B. Adequacy of Japanese forum**

▌ The plaintiff does not seriously dispute that the Japanese court can address the sort of claims asserted by LinkCo and that both Nichimen and Kanda are amenable to service of process in Japan. In addition, a multitude of courts have found Japan to be an adequate forum for purposes of forum non conveniens analysis. *See, e.g., Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 768–69 (9th Cir.1991); *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir.1990), *cert. denied*, 500 U.S. 953, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991); *Fluoroware, Inc. v. Dainichi Shoji K.K.*, 999 F.Supp. 1265, 1271 (D.Minn.1997); *Paterson, Zochonis (U.K.) Ltd. v. Compania United Arrows, S.A.*, 493 F.Supp. 626, 630 (S.D.N.Y.1980); *Del Monte Corp. v. Everett S.S. Corp.*, 402 F.Supp. 237, 244 (N.D.Cal.1973).

LinkCo assails the adequacy of a Japanese forum by alleging that the Japanese legal system provides inadequate opportunities to conduct pretrial discovery. *See In re Honda Am. Motor Co., Inc. Dealership Relations Litig.*, 168 F.R.D. 535, 538 (D.Md.1996) (noting "Japan's animosity towards common law discovery"). This is a common criticism of the Japanese system, but conventional wisdom regarding the unavailability of pretrial discovery in Japan will have to be reevaluated in light of the substantial revisions to the Japanese Code of Civil Procedure (*Minsohö* ) made effective January 1, 1998. *See Minsohö*, art. 312 (1998) (expanding scope of discovery). Whether the revisions will actually allow litigants significantly greater access to documents held by other parties remains to be seen. *See generally* Toshiro M. Mochizuki, *Baby Step or Giant Leap?: Parties' Expanded Access to Documentary Evidence Under the New Japanese Code of Civil Procedure*, 40 Harv. Int'l L.J. 285 (1999) (tentatively evaluating reforms). For present purposes, however, the scope of Japanese civil litigation reform is not controlling. "The case law is clear that an alternative forum ordinarily is not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules." *Mercier*, 981 F.2d at 1352–53.

*See also Lockman Found.*, 930 F.2d at 768 (holding Japanese forum to be adequate although discovery procedures were "not identical to those in the United States"). *Cf. Goldhammer v. Dunkin' Donuts, Inc.*, 59 F.Supp.2d 248, 255 (D.Mass.1999) ("the fact that there is less access to discovery in England than in federal court weighs against staying this action, but only slightly so").

I therefore find that the defendants have satisfied their burden of demonstrating that Japan is an adequate forum.

## C. Balance of public and private interests

Although Kanda has largely attempted to ride the coattails of Nichimen on this motion to dismiss, the two defendants stand in very different positions. The Japanese court has already rendered judgment in the case between LinkCo and Nichimen. Though Kanda testified before the Japanese court, he was not a party to the proceedings. Given this important distinction, it is appropriate to analyze and weigh the various public and private interest factors separately for each defendant.

### 1. Claims against Nichimen

#### a. Private factors

##### i. Access to sources of proof

■ Nichimen and LinkCo hotly dispute this factor. According to Nichimen, the majority of witnesses and documents are located in Japan. In addition, Nichimen contends that the majority of documentary evidence is available only in Japanese and would have to be translated for any proceedings in the United States. LinkCo contends that the majority of witnesses reside in Massachusetts and that it possesses more than 12,000 pages of documentary evidence in English that would

have to be translated for any proceeding in Japan.

It is unclear which party has the advantage in this regard. Both parties seem to inflate the number of documents and witness that would pose potential problems. Nonetheless, the dealings between LinkCo and Nichimen did take place on both continents, so it is reasonable to conclude that important witnesses and crucial documents will have to be gathered from both places. This factor does not weigh clearly in favor of either party.

##### ii. Availability of compulsory process

Nichimen claims that all of its relevant employees are available and subject to compulsory process in Japan. LinkCo does not dispute this, but complains that it will be prohibitively expensive to transport all of its own witnesses from the United States to Japan for trial. Conversely, Nichimen has suggested that at least one important witness, who is no longer an employee of Nichimen, is beyond the subpoena authority of this Court. This factor favors neither side. In addition, it should be given less weight as the trial already occurred in Japan (although it is on appeal).

##### iii. Comparative trial costs

Any trial based on the facts presented here will be extremely expensive. As both parties have noted, the documentary evidence is in both Japanese and English, and the witnesses reside in both the United States and Japan. Although Nichimen, a large multinational conglomerate, is more capable of bearing the costs of litigation than LinkCo, this Court cannot say that litigating in the United States would provide significant cost savings to either party. Moreover, many of the costs of litigating the action in Japan have already been incurred, offsetting the potential cost savings that the parties might otherwise

achieve in a United States court. In short, this factor is evenly balanced.

#### iv. Ability to enforce judgment

By treaty, LinkCo is entitled to "be accorded national treatment ... and most favored nation treatment with respect to access to the courts of justice ... within the territories of [Japan], in all degrees of jurisdiction, both in pursuit and in defense of [its] rights." Treaty of Friendship, Commerce and Navigation between the United States and Japan, April 2, 1953, 4 U.S.T.2063, art. IV, § 1. Therefore, Link-Co had the right to bring an action, as well as full appellate rights, in Japan.

Moreover, it is unclear whether this Court could even entertain LinkCo's suit in light of the potential res judicata effect of the final judgment rendered by the Japanese court. *See* Restatement (Third) of Foreign Relations Law of the United States § 481(1) ("[A] final judgment of a court of a foreign state ... is conclusive between the parties, and is entitled to recognition in courts in the United States."). *See also* Mass.G.L. ch. 235, § 23A (providing for recognition of foreign judgments). The grounds for not recognizing the final judgment of a foreign court are limited. *See* Restatement (Third) of Foreign Relations Law of the United States § 482(2) (ability to discard foreign judgment is limited to situations where foreign court lacked subject matter jurisdiction; defendant did not receive notice of the proceedings in sufficient time to enable him to defend; the judgment was obtained by fraud; the cause of action on which the judgment was based, or the judgment itself, is repugnant to the public policy of the United States; the judgment conflicts with another final judgment that is entitled to recognition; or the proceeding in the foreign court was contrary to an agreement between the parties to submit the controversy on which the judgment is based to another forum); Mass.G.L. ch. 253, § 23A (same).

Even if LinkCo surmounted the res judicata barrier and obtained a favorable judgment from this Court, it is unlikely that it could enforce such a judgment in Japan now that a Japanese court has spoken. *See* Takao Sawaki, *Recognition and Enforcement of Foreign Judgments in Japan*, 23 Int'l Law. 29, 34–35 (1989) (indicating that Japanese courts would reject action to enforce a United States judgment where a Japanese court has already ruled on the non-existence of liability); *see also Fluoroware*, 999 F.Supp. at 1273 (noting that the possibility that plaintiff could not enforce a favorable judgment in Japan counsels in favor of dismissal).

In light of LinkCo's access to Japanese courts, the res judicata implications of the Japanese judgment and the difficulty in enforcing any judgment in Japan, this factor weighs heavily in Nichimen's favor.

#### v. Other private factors

One private factor that must count strongly against LinkCo is the fact that it has purposefully availed itself of the opportunity to engage in business in Japan with Japanese companies. LinkCo should be expected to submit to the judicial process in a foreign jurisdiction to which it has directed the vast majority of its business efforts. Unlike the situation where a United States plaintiff has been injured by a foreign defendant with whom he had no previous relationship, LinkCo was aware that its dealings in Japan—like any extensive business dealings—held the potential for litigation. Instead of accepting the prospect of resolving this dispute in Japan, LinkCo appears to have snubbed the Japanese court at several turns.

### b. Public factors

#### i. Judicial economy

This factor strongly favors Nichimen. Over the past two-and-a-half years the

Japanese court has taken evidence, heard arguments, and rendered judgment in the entire matter. To relitigate the matter before this Court would not only be largely duplicative of the Japanese court's efforts, it would require considerable additional expense because the earlier proceedings were conducted entirely in Japanese.

### ii. Relations to the community

This factor favors LinkCo. Although a Massachusetts jury has a greater relation to claims in which the allegedly wrongful conduct takes place entirely within the State, there are numerous allegations of misconduct in Massachusetts. Nichimen employees visited Massachusetts for two weeks during 1997 when they allegedly purloined the proprietary information of a Massachusetts corporation in violation of a contract and Massachusetts tort law.

### iii. Familiarity with applicable law

This factor weighs, at least in part, in favor of LinkCo. Since choice of law questions on the contract claims have not been fully decided, there is some risk that this Court would be forced to apply Japanese law. However, with regard to LinkCo's claims based on Massachusetts tort and unfair competition law, this Court clearly is more familiar with applicable precedent.

The Japanese court's analysis of Massachusetts law was, to say the least, laconic. Although the court cited the Massachusetts unfair business practices statute, Mass.G.L. ch. 93A, it cited no Massachusetts trade secret cases and engaged in no written analysis of Massachusetts law. The complete absence of discussion or citation to case authority in the Japanese decision is somewhat disconcerting. The Japanese court may have misunderstood or disregarded basic principles of Massachusetts law. Or this may simply be a matter of dissimilar judicial traditions. Unlike the American civil tradition, where the judge's written opinion analyzes statu-

tory language and the precedential value of published case law, "[u]nder the civil law traditions of Japan, a judge simply calls attention to the specific statute invoked as authority." Elliott J. Hahn, *An Overview of the Japanese Legal System,* 5 Nw. J. of Int'l L. & Bus. 517, 536 (1983). Possibly, the Japanese court was prevented from engaging in a thoroughgoing analysis of Massachusetts law because of inadequate briefing. LinkCo did not provide the Japanese court with copies of the non-disclosure agreements, did not provide the court with any indication of the content of its alleged trade secrets, and did not allow its chief representative to be examined by the court. This factor might have counted more strongly in favor of LinkCo if it had participated vigorously in the Japanese court proceedings.

### iv. Other public factors

Where a foreign court has already rendered judgment on the very facts of the case, an additional public factor that weighs strongly in favor of Nichimen is the overall concern for maintaining comity among courts. Comity has long been understood as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). This notion of comity entails a peculiar "blend of courtesy and expedience." *Canadian Filters (Harwich) Ltd. v. Lear–Siegler, Inc.,* 412 F.2d 577, 578 (1st Cir.1969); *see also Hilton,* 159 U.S. at 163–64, 16 S.Ct. 139 (" 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other"). Comity's amor-

phous nature should not, however, obscure the important public policies it serves.

> [T]he central precept of comity teaches that, when possible, the decisions of foreign tribunals should be given effect in domestic courts, since recognition fosters international cooperation and encourages reciprocity, thereby promoting predictability and stability through satisfaction of mutual expectations. The interests of both forums are advanced—the foreign court because its laws and policies have been vindicated; the domestic country because international cooperation and ties have been strengthened. The rule of law is also encouraged, which benefits all nations.

*Laker Airways, Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C.Cir.1984).

Given these strong policy considerations, this Court is hesitant to disregard the Japanese court's judgment and proceed with the claims against Nichimen, especially where LinkCo did not fully respect the legitimacy of the foreign proceedings.

### c. Balance of factors

On balance, Nichimen has demonstrated that unfairness would result if the claims against it were allowed to proceed before this Court. Several of the applicable factors strongly favored Nichimen; few weighed in favor of LinkCo. Moreover, the majority of factors favoring LinkCo weighed only lightly in its favor. Dismissal of the claims against Nichimen will best serve the convenience of the parties, international comity and the ends of justice. *See MLC (Bermuda) Ltd. v. Credit Suisse First Boston Corp.*, 46 F.Supp.2d 249, 254 (S.D.N.Y.1999) ("[A] plaintiff's choice of forum is entitled to much less weight when it is made after the filing of a concurrent action arising out of the same series of transactions.").

### 2. Claims against Kanda

### a. Private factors

#### i. Access to sources of proof

■ This factor slightly favors LinkCo. Given the nature of the former extensive relationship between LinkCo and Kanda, there is likely to be substantial access to sources of proof in the United States. Unlike Nichimen, which only had direct contact with Massachusetts for one two-week visit, Kanda visited LinkCo at least ten times and (according to LinkCo) perhaps on a monthly basis. The Court is mindful of the fact that witnesses and documents in favor of Kanda will have to be transported from Japan in the event of a trial. However, such an outcome is unavoidable in this type of litigation. Discovery inconvenience can be minimized by videoconferencing.

#### ii. Availability of compulsory process

This factor strongly favors Kanda. It is likely that certain witnesses, including those from Fujitsu or the Japanese Ministry of Finance, will be subject to compulsory process in Japan, yet beyond this Court's powers of subpoena.

#### iii. Comparative trial costs

Although this litigation will be financially burdensome to both parties, there is no persuasive indication that it would be considerably easier or less costly in Japan. In either forum, the trier of fact will have to consider testimony from foreign witnesses and evidence translated from a foreign language. This factor therefore favors neither party.

#### iv. Ability to enforce judgment

This factor also counts in favor of LinkCo. Although Kanda asserts that any judgment from this Court in favor of LinkCo may not be recognized in Japan, this

Court finds no basis for such a conclusion. *See Minsohö*, art. 118 (setting forth procedure for enforcing foreign judgments in Japanese courts). *See also* Treaty of Friendship, Commerce and Navigation between the United States and Japan, April 2, 1953, 4 U.S.T.2063, art. IV, § 1 (granting American companies full access to Japanese legal remedies). Unlike Nichimen, Kanda has not filed a parallel proceeding in Japan that would threaten the enforceability of a favorable judgment from this Court. *Cf. Fluoroware*, 999 F.Supp. at 1273 (noting pendency of parallel actions in Japanese forum).

### b. Public factors

#### i. Judicial economy

This factor also favors LinkCo. Since there is no action pending in a court in a foreign jurisdiction, there is no risk of duplicative proceedings. Moreover, although this case may present certain difficulties in terms of translating documents or securing the testimony of foreign witnesses, those concerns apply with equal force to adjudication in the Japanese forum. Finally, this Court's docket is not swamped and can easily handle a trial in a timely fashion.

#### ii. Relations to the community

As stated earlier, this factor favors LinkCo to a limited extent. Although a Massachusetts jury has a greater relation to claims in which the action takes place entirely within the State, there are numerous allegations of misconduct that took place in Massachusetts. If Kanda did steal intellectual property from Massachusetts to set up a rival business in Japan, this forum has a significant interest in protecting those trade secrets. The case would therefore not impose on jurors the obligation to hear a case that has no relation to their community.

#### iii. Familiarity with applicable law

This factor favors LinkCo. At present, the record lacks the factual specificity that would allow the Court to fully determine choice of law questions. Kanda argues that some of LinkCo's claims (particularly the employment contract and fiduciary duty claims) will be governed by Japanese law. *See, e.g., Pepe v. Rival Co.*, 85 F.Supp.2d 349, 381 (D.N.J.1999) (applying law of the state where employee was located and performed job duties, rather than law of state where employer had principal place of business), *aff'd*, 254 F.3d 1078 (3d Cir.2001). *But see Gries v. Zimmer, Inc.*, 709 F.Supp. 1374, 1381 (W.D.N.C.1989) (applying law of state where employer had principal place of business). Regardless of the outcome of that dispute, other claims (particularly those relating to the misappropriation of trade secrets from LinkCo's Massachusetts facility and unfair trade practices) will likely be governed by Massachusetts law. *See* Mass.G.L. ch. 93A, § 11 (requiring that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.").

### c. Balance of factors

On balance, I find that Kanda has not satisfied his burden of demonstrating that serious unfairness would result from allowing all of the claims against him to proceed before this Court. However, I will be fully mindful of the expense of litigation in handling discovery disputes. In addition, this Court is fully equipped with videoconferencing technology and therefore the inconvenience to the parties can be minimized by presenting witnesses in Japan to the jury on a screen.

### III. CONCLUSION AND ORDER

For the reasons stated above, Nichimen's motion to dismiss (Docket No. 12) *ALLOWED*. Kanda's motion to dismiss (Docket No. 13) is *DENIED.*